(December 18, 1895.)

### STATE v. MASON.

[43 Pac. 63.]

ARSON—CONFESSION EXTORTED BY THREATS.—A confession, so called,
which the record shows was extorted from the defendant by
threats and menaces, and which does not .connect the defendant
with the alleged crime should not be permitted in evidence.
(Syllabus by the court.)

APPEAL from District Court, Fremont County.

Evans & Rogers, for Appellant (Quarles & Averitt, of Coun-
sel).

The only evidence offered and claimed by the prosecution to
prove a conspiracy is contained in plaintiff's exhibit "C."  How
any fair-minded person can claim this to be a conspiracy is
more than we can comprehend.   A careful perusal thereof shows

that the defendant was approached by Hammon with a proposi-tion to fire the place, but that he refused to have anything to do with it. Also that Hammon was the one who fired it, and that this defendant assisted in no way in committing the act complained of. The acts of the defendant do not constitute even evidence of guilt. (3 Greenleaf on Evidence, 15th ed., 89; 2 Bishop's New Criminal Law, 171-175; Wharton's Criminal Evidence, 440; *Hicks v. United States,* 150, U. S. 442, 14 Sup. Ct. Rep. 144; *State v. Carson,* 36 S. C. 524, 15 S. E. 588; *Searles v. State,* 6 Ohio Ct. Rep. 331; S. C., Am. Dig. 1892, p. 1267; *People v. Woodward,* 45 Cal. 293, 13 Am. Rep. 176, and note; *People v. Ah Ping,* 27 Cal. 490; *State v. Connaughty,* 1 Wis. 159; *State v. Farr,* 33 Iowa, 553; *Elizando v. State* (Tex.), 20 S. W. 560; *State v. Martin,* 25 Ga. 494.) The court erred in admitting in evidence plaintiff's exhibit "C" which was the purported confession of the defendant. It was no confession of his guilt, but only confessed or declared that J. M. Hammon set fire to the place, and expressly negatives the idea that the defendant had anything whatever to do with the same. Our contention upon this point is that from the uncon-tradicted evidence in the case at least one of the objections made against the acceptation of the statement in evidence is well taken, and that is that the confession was induced by promises and hope of reward, and by means of undue influence and while the defendant was under duress. (2 Russell on Crimes, 5th Am. ed., 824-829; 1 Greenleaf on Evidence, 220, and cases cited; Abbott's Trial Brief (Criminal Causes), 496, and cases; Whar-ton's Criminal Evidence, sec. 651; 3 Am. & Eng. Ency. of Law, 449 et seq.; *State v. Phelps,* 11 Vt. 116, 34 Am. Dec. 672; *State v. Newman,* 49 Ala. 9, S. C., 1 Am. Crim. Rep. 173; *People v. Phillips,* 42 N. Y. 200; *People v. Flagg,* 40 Mich. 706, S. C., 3 Am. Crim. Rep. 70.)

Attorney General George M. Parsons, for the State.

The existence of a conspiracy had at least been shown *prima facie.* The confession of defendant shows conclusively that he aided and assisted Hammon in his nefarious work. Dr. Whar-ton says relative to the acts of co-conspirators: "The least de-gree of collusion is sufficient to make the act of one the act of

all." (2 Wharton on Evidence, sec. 1205; *State v. Anderson,* 92 N. C., 747; 3 Wharton's American Criminal Law, secs. 2353-2355.) It is nowhere contended by the state that the paper offered in evidence was a confession, although we contend that the statement in question, taken in connection with other evidence, tended to establish guilt, and was therefore admissible. A confession, technically, "is a person's declaration of his agency or participation in a crime. The term is restricted to acknowledgments of guilt." (*People v. Velerde,* 59 Cal. 457; *People v. Strong,* 30 Cal. 151.) In order to make a confession inadmissible because of inducements or threats, such inducements or threats must be held out or made "by one in authority," and to be one in authority one must be an officer of the law. (1 Wharton's Criminal Evidence, secs. 650, 651; 1 Wharton's American Criminal Law, 692; *Rex v. Sleeman,* 6 Cox C. C. 245; *United States v. Stone,* 8 Fed. 252-254; *Ullrich v. People,* 39 Mich, 245, 250; *State v. Patterson,* 73 Mo. 695-706; *Beggerly v. State,* 8 Baxt. 520; *State v. Carrick,* 16 Nev. 120-130.) McCarthy, the so-called detective, was not a person in authority in such respect as to make the statement under the circumstances inadmissible as a confession. (*Regina v. Moore,* 5 Cox C. C. 555, 558; *Regina v. Reason,* 12 Cox C. C. 228, 229.) Relative to the voluntary character of a confession, the following is the established rule: "The presumption is that confessions have been freely made, until the contrary appears." (2 Russell on Crimes, p. 89, side p. 870; *People v. Barker,* 60 Mich. 277, 1 Am. St. Rep. 501, and note, 27 N. W. 539-545; *Commonwealth v. Culver,* 126 Mass. 464, 465.)

HUSTON, J.—The defendant was indicted, jointly with one J. W. Hammon, for the crime of arson, in the burning of certain buildings, and other property, belonging to said Hammon. On arraignment, separate trials were given the defendants. Hammon was tried and acquitted. On the trial of Mason, the following writing, which the evidence clearly shows was extorted from him by one McCarty, a detective in the employ of the Continental Insurance Company (which institution had a policy of insurance on the property burned), was offered in evidence, and received by the court, in words and figures as fol-

lows, to wit: "Interrogatorics by Thómas McCarty, in the pres-
ence of Sheriff J. B. Cutshaw, and Deputy Sheriff W. W. Green:
Q. What is your name and age? A. Charles Mason; age,
twenty-one years. Q. Where do you reside? A. Hooper. Utah.
Q. How long have you been living with J. M. Hammon? A.
about six years. Q. How long were you living with him prior
to the fire, November 25, 1893? A. About three months. Q.
Do you know, of your own knowledge, how the fire originated
which destroyed the Hammon buildings and contents? A.
Yes, sir. Q. Go on and state to the gentlemen all you know
about it, if you wish. A. About three weeks before the fire, J.
M. Hammon came to me and told me about firing it. Q. Tell
what he said, and how he said it. A. We were right at home,
then, when he said, 'If I could keep a secret, we would make
some money.' I asked how we could make money, and he said
he could make money by firing the building, and asked me if I
would set it on fire. This I refused to do. He said, 'I will fire
it myself.' We talked about it several times after that. The
day of the fire he told me he would set the fire that night.
About 6 o'clock the evening of the fire, Daunt Hammon and
myself went over to the house of H. Hammon, stayed there un-
til about 9 o'clock, and returned to Daunt Hammon's house,
and about half past ten Daunt Hammon took a coal-oil can,
poured the oil on the floor in the kitchen, near the stove, and set
a match to it. He then took a coal-oil can, and then went to
the barn, in which we had driven the horses that evening. He
was gone for a few minutes. He said, when he went out, he
was going to set the barn on fire. When he came back he said,
'Go to pulling the things out of the house,' which I did. At the
time he set fire to the house I was standing near the sitting-
room, near the door. Levy Hammon and his wife were stand-
ing outside the house at this time. I do not know whether they
were informed that the place was going to be set on fire or not.
I drove the horses in the barn at his request, about sundown
that evening. He wanted me to put some of my horses in with
his, and burn them. He said it would not look suspicious if
some of mine burned with his. I refused to do it, as I hated
to have some of mine burned up. He took the stallion up to
Mr. Daws' about a week before the fire. He told me he did not

want him burned up, and that was the reason he took him up. I am sorry I did not inform the officers of the proposition he made me, before the fire; and I make this statement of my own free will, and voluntarily, without hope of reward, and as far as I can to undo the wrong that I have done; and the above facts are absolutely truth. So help me God. [Signed] Charles Mason. Subscribed and sworn to before me this December 15, 1893. F. S. Branwell, Clerk, by W. E. Patrie, Deputy. [Seal]"

That the so-called confession was prepared in advance by the armed emissary of the insurance company is evidenced by the following testimony of Walter Patrie, a witness for the prosecution: "I am slightly acquainted with Charles Mason. I believe I was present in the sheriff's office at the time he is said to have made a statement to Thomas McCarty. I was requested by Mr. Green to come down to the jail and write out an affidavit that Mason was going to make. I didn't understand at the time it was a confession. I took the machine down as Mr. Green requested, and wrote down the questions and answers to the questions as they were given to me. Mr. McCarty gave the questions, and Mr. McCarty and Mason gave the answers. Mason gave the answers first. Q. I ask you if the statement had not been written out, and if the questions were not read from the statement by McCarty, and the answers made by him, and if Mason was not then asked if the answers were not correct. A. To the best of my recollection that is correct." This is the only evidence in the record which pretends in the slightest degree to connect the defendant with the arson, and it is palpable, from the record, that the defendant is an under-witted boy, and that this so-called confession was extorted from him by an armed bully, sometimes denominated a "detective," in the employ of the insurance company. We have searched the record in vain to find anything therein directly or indirectly, or by inference, connecting this defendant with the alleged crime. The manuscript is voluminous, containing a great deal of evidence in regard to the apparent cause of the fire; and counsel, in their zeal, seem to overlook the fact that all this evidence has no pertinency in connecting this defendant with the alleged crime. It is, of course, to the interest of the insurance company that this defendant, or some other, should be convicted, and in that be-

half a strenuous effort has been made; but we do not believe that even the interests of an insurance company would warrant us in affirming the conviction of a half-witted boy upon such a showing as is made by this record. The judgment of the district court is reversed, and the defendant ordered discharged.

Morgan, C. J., and Sullivan, J., concur.